# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO
### 2010 – CV – 01063-BNB

FILED
U.S. DISTRICT COURT
DISTRICT OF COLORADO

2010 JUN -9 PM 12: 28

GREGORY C. LANGHAM
CLERK

BY_____DEP. CLK

Civil Action No. _____

(To be supplied by the court)

James R. Lawson
_____, Plaintiff,

v.

J. Ailn R.N. ,
_____,

Dr. Scott Anderson M.D.,
_____,

Carolyne M. Batchelor,
_____,

Marnie Barrian C.P.A,
_____,

Amy Bonifacio,
_____,

Jim W. Boye,
_____,

David Cannella,
_____,

**(CONTINUED ON THE NEXT PAGE)**
_____, Defendant(s).

(List each named defendant on a separate line.)

---

**AMENDED**  COMPLAINT  **AND JURY DEMAND**

---

**(DEFENDANTS CONTINUED)**

Scott Clements M.D.,

Keith Dangleis M.D.,

Mike DeFranco,

Thomas Drake M.D.,

Andrew Fedorwicz M.D,

Mr Franklin,

Mr. Goff,

Alan Greenberg,

Tim Gulbranson EMT,

**(CONTINUED ON THE NEXT PAGE)**

**(DEFENDANTS CONTINUED)**

Terry Hobson,

Maria Jones,

Lindsey Linder,

Carolyne Nye,

Caroline M. Sada,

Susan Sanders,

Randy Shaw,

Tim Smith

Bridget Szobar EMT,

**DEFENDANTS**

## PARTIES

1. Plaintiff <u>James R. Lawson</u> is a citizen of <u>the state of Colorado</u>

   who presently resides at the following address:
   <u>764 S Osage St, PO Box 9758, Denver, CO 80209-0758</u>

2. Defendant <u>J. Ailn R.N.</u> is a citizen of <u>the United States</u>

   who live(s) at or is/are located at the following address:
   <u>525 S Downing St; Denver, CO 80210-5876</u>

3. Defendant <u>Dr. Scott Anderson M.D</u> is a citizen of <u>the United States</u>

   who live(s) at or is/are located at the following address:
   <u>11050 153rd Dr, Brighton, CO 80602</u>

   (Attach a separate page, if necessary, to list additional parties.)

## JURISDICTION

4. Jurisdiction is asserted pursuant to following statutory authorities:
   28 U.S.C. § 1331: "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."
   42 U.S.C. 21 §§ 1981, 1981A, 1983, 1985 & 1988 CIVIL RIGHTS.
   The 1st and 4th Amendments to the U.S. Constitution

5. Briefly state the background of your case:

1) Plaintiff James R. Lawson/Pro Se brings this action individually and collectively against the Defendants J. Ailn R.N., Dr. Scott Anderson M.D., Carolyne M. Batchelor, Marnie Barrian C.P.A, Amy Bonifacio, Jim W. Boye, David Cannella, Scott Clements M.D., Keith Dangleis M.D., Mike DeFanco, Thomas Drake M.D., Andrew Fedorwicz M.D, Mr Franklin, Mr. Goff, Alan Greenberg, Tim Gulbranson EMT, Terry Hobson, Maria Jones, Lindsey Linder, Carolyne Nye, Caroline M. Sada, Susan Sander, Randy Shaw, Tim Smith, and Bridget Szobar EMT, hereinafter referred as the Defendants.

2) Plaintiff Lawson is a 72 year old type II diabetic who has received all his medical care for the last few years at the Denver Veterans Administration.

3) As a Type II diabetic Plaintiff Lawson is covered by the ADA 42 U.S.C. § 12133 (2002). Accordingly Plaintiff Lawson is more susceptible than an average or normal person to injuries to his reputation, sever emotional distress, and depression.

4) The defendants conspired to deny the Plaintiff's Statutory Civil and Rights repeatedly violated the Plaintiff's statutory civil rights under color of law and 42 U.S.C 1395 (CC) (a) and 1395 42 U.S.C. 1395 (DD) by the Defendants. Damages can be awarded under 42 U.S.C. 21 §§ 1981, 1981A, 1983, 1985 & 1988 CIVIL RIGHTS.

5) The Defendants Denied the Plaintiff's constitutional civil Rights under the 1st Amendment and HIPPA, 42 U.S.C.1320d-6 § 164.506 under color of law .. And under section 1977 (42 U.S.C. 1981) which provides for the recovery of compensatory and punitive damages in cases of intentional violations of Title VII, the ADA, and section 501 of the Rehabilitation Act of 1973. Damages can also be awarded under 42 U.S.C. 21 §§ 1981, 1981A, 1983, 1985 & 1988 CIVIL RIGHTS

6) The Defendants knowingly and intentionally conspired to obstruct justice by intimidating a witness, a juror, or the Plaintiff, under color of law and 42 U.S.C. 1985 (2), attempt to obstruct justice. The Defendants knowingly, maliciously, and intentionally conspired to deny the Plaintiff's civil rights under the 4th amendment to the constitution by seizing control of a spend thrift trust for real property, which was never owned by the Plaintiff, for which he was never a trustee, and which he was not named as a beneficiary simply because he lived on the property, which is actionable under 42 U.S.C. 1985 (3). And damages can be awarded under Damages can be awarded under 42 U.S.C. 21 §§ 1981, 1981A, 1983, 1985 & 1988 CIVIL RIGHTS

7) The Defendants knowingly and intentionally conspired to participate in acts of civil Racketeering under color of law, as defined by 18 U.S.C. 1981 & ff, as well as medical billing fraud and Medicare fraud. 18 U.S.C. 1981 & ff provides for an award of treble damages for civil racketeering activities. Under C.R.S. C R S 13-21-122 Civil Liability for unlawful use of personal identifying information; and C.R.S. 13-121-109.5. Recovery of damages for fraudulent use of social security numbers. statutory award of $10,000.00 for every unlawful use of an individual's personal identifying information.

8) Under Restatement of Second Torts Section 46 cmt. H(1965), Defendants knowingly intentionally, maliciously, and outrageously inflicted Intentional and Negligent sever emotional distress, severe emotional pain, mental anguish, loss of enjoyment of life, thoughts of suicide, isolation from friends and family, sleeplessness, anxiety, stress, depression, blood pressure increases, headaches, humiliation, extreme and outrageous intentional invasions of emotional tranquility, and other non pecuniary losses on the Plaintiff by their behavior and actions, which can be awarded damages under 42 USC 1981 – 1988 and section 1977 (42 U.S.C. 1981) to provide for the recovery of compensatory and punitive damages in cases of intentional violations of Title VII, the ADA, and section 501 of the Rehabilitation Act of 1973

**Additional Defendants:**

3) Defendant Carolyne M. Batchelor,                    the United States
   Who live(s) at or is/are located at the following address
   770 W Hampden Ave Ste 200, Englewood, CO 80110

4) Defendant Marnie Barrian C.P.A,                    the United States
   Who live(s) at or is/are located at the following address
   10700 E Geddes Ave Se 200;
   Englewood, CO 80112

5) Defendant  Amy Bonifacio,                            the United States
    Who live(s) at or is/are located at the following address
    500 E  84th Ave Ste C8
    Denver, CO 80229

6) Defendant  Jim W. Boye,                              the United States
    Who live(s) at or is/are located at the following address
    2425 S Downing
    Denver, CO 80219

7) Defendant  David Cannella,                           the United States
    Who live(s) at or is/are located at the following address
    390 Printers Parkway
    Colorado Springs, CO 80910

8) Defendant  Scott Clements M.D.,                      the United States
    Who live(s) at or is/are located at the following address
    4350 Wadsworth Blvd
    Wheatridge, CO 80039-4634

9) Defendant  Keith Dangleis M.D.,                      the United States
    Who live(s) at or is/are located at the following address
    10700 E Geddes  AVE Suite 200
    Englewood, CO 80112

10) Defendant  Mike DeFranco                            the United States
    500 E 84th Ave Ste C6
    Denver, CO 80229

11) Defendant  Thomas Drake M.D.,                       the United States
    Who live(s) at or is/are located at the following address
    10700 E Geddes Ave Ste 200
    Englewood, CO 80112

12 ) Defendant  Andrew Fedorwicz M.D,                   the United States
    Who live(s) at or is/are located at the following address
    4350 Wadsworth Blvd
    Wheatridge, CO 80039-4634

13) Defendant  Mr Franklin,                                    the United States
   Who live(s) at or is/are located at the following address
   3360 S Wadsworth Blvd Ste 150
   Lakewood, CO 80210

14) Defendant  Mr. Goff                                        the United States
   Who live(s) at or is/are located at the following address
   500 E 84th Ave Ste C8
   Denver, CO 80229

15) Defendant Alan Greenberg,                                  the United States
   Who live(s) at or is/are located at the following address
   770 W Hampden Ave
   Englewood, CO 80110

16) Defendant  Tim Gulbranson EMT,                             the United States
   Who live(s) at or is/are located at the following address
   Paramedic Division
   877 Bannock St
   Denver, CO

17) Defendant  Terry Hobson,                                   the United States
   Who live(s) at or is/are located at the following address
   4521 Kipling St Ste 200
   Wheatridge, CO

18)  Defendant Maria Jones                                     the United States
   Who live(s) at or is/are located at the following address
   390 Printers Parkway
   Colorado Springs, CO 80910

19) Defendant  Lindsey Linder,                                 the United States
   Who live(s) at or is/are located at the following address
   4521 Kipling St Ste 200
   Wheatride, CO

20) Defendant  Carolyne Nye,                                   the United States
   Who live(s) at or is/are located at the following address
   8140 Holly St
   Centennial, CO

21) Defendant Caroline M. Sada,                           the United States
Who live(s) at or is/are located at the following address
770 W Hampden Ave
Englewood, CO 80110

22) Defendant Susan Sanders                               the United States
Who live(s) at or is/are located at the following address
10700 E Geddes Ave Se 200;
Englewood, CO 80112

23) Defendant  Randy Shaw,                                the United States
Who live(s) at or is/are located at the following address
390 Printers Parkway
Colorado Springs, CO 80910

24) Defendant Tim Smith                                   the United States
Who live(s) at or is/are located at the following address
7351 E Lowry Blvd
Denver, CO 80230

25) Defendant Bridget Szobar EMT,                         the United States
Who live(s) at or is/are located at the following address
829 Marion St
Denver, CO 80218


**Additional Statutory Authorities:**

42 U.S.C. 1985 (3) Conspiracy to interfere with civil rights

42 U.S.C.1985 (2) Obstructing justice; intimidating party, witness, or juror

42 U.S.C. 126   (A) § 12131 and 12132  Americans with Disabilities Act

Restatement of Second Torts Section 46 cmt. H(1965)

 Public Law 104-191 Health Insurance Act of 1996

42 U.S.C  1320d-6, subpart E (Security and Privacy) § 164.506 Consent for uses or disclosures
(of private medical information) to carry out treatment, payment, or health care operations
HIPPA.

# FIRST CLAIM FOR RELIEF
## AND SUPPORTING FACTUAL ALLEGATIONS
(Please number your paragraphs and attach any necessary additional pages.)

{The defendants conspired to deny the Plaintiff's Statutory Civil Rights under U.S.C 1395 (CC) (a) and 1395 42 U.S.C. 1395 (DD) and repeatedly violated the Plaintiff's statutory civil rights under color of law. Unlimited damages can be awarded under 42 U.S.C. 1981, 1981A, 1983, 1985 & 1988 CIVIL RIGHTS. and 42 U.S.C. § 1985 (3) (Depriving persons of rights or privileges)

9)   Plaintiff incorporates paragraphs 1 through 8 of this complaint.

10)  Plaintiff alleges the defendants conspired to violate Plaintiff's civil rights under 42 USC 1395 (DD)(a) And 42 USC 1395 (DD).

i. Violation of the Plaintiff's civil rights:

42 U.S.C. 1395 (CC) (a) & (DD); 42. U.S.C. 1982 – 1988; and

C.R.S. 15-18.5-103

1) Violation of a Patient's Right of Self Determination to accept or refuse medical treatment; 2) Unprofessional Conduct/Transfer of Principal; 3) Violation of the legally required informed consent mechanism, 4) Violation of the Patient's HIPPA Rights of Privacy; 5) Violation of the legally required Patient Grievance Procedures.

2) Violation of these civil Rights can be awarded Damages under 42. U.S.C. 1982 – 1988 Plus attorney's fees.

11)  Conspiracy to deny civil rights has three elements:

    a.   Two or more persons must conspire together to injure, oppress, threaten or intimidate one or more victims.

    b.   The defendant intended by the conspiracy to hinder, prevent, or interfere with a person's free exercise or enjoyment of a right secured by the Constitution or laws of the United States.

    c.   At least one of the intended victims must be an inhabitant of a state or territory of the U.S. Plaintiff Lawson was a resident of the state of Colorado at all times relevant to this action.

12)  Proof of Conspiracy

A conspiracy is an agreement by two or more persons to accomplish some unlawful purpose, or to accomplish a lawful purpose by unlawful means. United States v. Feola, 420 U.S. 671, 695-96 (1975). Thus, a conspiracy is a kind of

partnership in criminal purposes in which each member becomes the agent of every other member.

It is no defense that a defendant's participation in a conspiracy was minor or for a short period of time. Nor does the government [Plaintiff] have to prove that each conspirator joined the conspiracy at the time of its formation, or that each conspirator played an equal role in the conspiracy. United States v. Saavedra, 684 F.2d 1293, 1301 (9th Cir. 1982). A person may be a member of a conspiracy even though the person does not know all of the purposes of the conspiracy. United States v. Escalante, 637 F.2d 1197, 1200 (9th Cir. 1980). A single conspiracy may include subgroups or subagreements, and the evidence need not exclude every hypothesis other than that a single conspiracy exists. United States v. Patterson, 819 F.2d 1495, 1502 (9th Cir. 1987). The Government [Plaintiff] need only prove a slight connection between the defendant and the conspiracy. United States v. Cuevas, 847 F.2d 1417 (9th Cir. 1988).

The Government [Plaintiff] need not prove that the agreement between the co-conspirators was express or formal. The evidence must show that the defendants positively or tacitly came to a mutual understanding to try to accomplish an unlawful plan. See Pereira v. United States, 397 U.S. 1, 12 (1954). Ordinarily, only the results of a conspiracy, rather than the agreement itself, are observable. The existence of the conspiracy need not be proved by direct evidence but may be inferred from all of the facts and circumstances of the case. United States v. Disla, 805 F.2d 1340, 1348 (9th Cir. 1986). Traditionally, courts look to the conduct of the alleged conspirators to find proof of the agreement.

13) Time is not a material fact in conspiracy charge. US V Ghant, 339 F3d (8th Cir. 2003).

14) The Emergency Medical Treatment and Active Labor Act (42 U.S.C. § 1395dd, EMTALA) EMTALA applies to "participating hospitals", i.e., those that accept payment from the Department of Health and Human Services, Centers for Medicare and Medicaid Services (CMS) under the Medicare program. However, in practical terms, EMTALA applies to virtually all hospitals in the U.S., with the exception of the Shriners Hospitals for Children, Indian Health Service hospitals, and Veterans Affairs hospitals. The combined payments of Medicare and Medicaid, $602 billion in 2004, or roughly 44% of all medical expenditures in the U.S., make not participating in EMTALA impractical for nearly all hospitals. EMTALA's provisions apply to all patients, and not just to Medicare patients.

15) It is only where a plaintiff has stated a federal claim that a notice of claim provision may be struck down based on supremacy because allowing a federal claim to be limited by state law would defeat the objective of the federal law. King v. United States, 53 F.

Supp.2d 1056 (D. Colo. 1999), rev'd on other grounds, 301 F.3d 1270 (10th Cir. 2002), cert. denied sub nom. McKillop v. United States, 539 U.S. 926, 123 S. Ct. 2572, 156 L. Ed. 2d 602 (2003).

16) Action against public employee for willful and wanton conduct is not subject to the notice provisions of the Governmental Immunity Act. Pacino v. Sanchez, 807 P.2d 1231 (Colo. App. 1990).Notice does not apply to claims for civil rights violations. Mucci v. Falcon Sch. Dist., 655 P.2d 422 (Colo. App. 1982); Barrack v. City of Lafayette, 829 P.2d 424 (Colo. App. 1991); Conners v. City of Colo. Springs, 962 P.2d 294 (Colo. App. 1997), aff'd, 993 P.2d 1167 (Colo. 2000).

18) Notice not applicable to federal Emergency Medical and Active Labor Act (EMTALA), 42 U.S.C. § 1395dd, claim. EMTALA preempts the Colorado Governmental Immunity Act's notice requirement because the state statute is potentially in direct conflict with EMTALA's statute of limitations. The state procedural requirement stands as an obstacle to the accomplishments and execution of Congress's objectives in enacting EMTALA.

19) Bird v. Pioneers Hosp., 121 F. Supp.2d 1321 (D. Colo. 2000)."The innocent individual who is harmed by an abuse of governmental authority is assured that he will be compensated for his injury." Owen v. City of Independence, 445 U.S. 622 (1980)

21) Defendants Tim Gulbranson EMT and Bridget Szobar EMT, are employees of the Denver Hospital Authority dba Denver health which a part of the City of Denver and do not have any immunity, qualified or absolute, for their acts.

22) Defendants Tim Gulbranson and Bridget Szobar threatened the plaintiff when he refused transport, which is an element of civil racketeering.

23) Defendants Tim Gulbranson and Bridget Szobar denied the plaintiff's right to refuse transport and treatment under 42 U.S.C. 1395 (DD), which clearly states when an individual comes in contact with hospital personal and refuses treatment the hospital shall immediately have the patient sign a form releasing the hospital for all liability recommending the individual see their own private physician for evaluation. Defendants Tim Gulbranson and Bridget Szobar did not perform their duty by providing the Plaintiff the required paperwork and physically threatened him when he refused transport.

24) Defendants Tim Gulbranson and Bridget Szobar transported the Plaintiff to Porter Adventist Hospital.

25) The admitting Defendant doctor, which is listed on the paperwork as Andrew N Fedorowicz, M.D. was informed by the plaintiff he did not want any treatment, and the Defendant doctor ignored his refusal and failed to order that the appropriate forms, as referenced in paragraph 23, be completed by hospital personnel and the Plaintiff either be released or transported to another facility that would release him.

35) The right to refuse treatment constitutionality was first established in <u>Quinlan</u> (cf. In re <u>Quinlan.</u> 70 N.J. 10, 355 A.2d 647 (1976)) based on the right to privacy and has been reiterated by many state courts on the same basis. On the federal level the right to refuse treatment was upheld in <u>Cruzan</u> (cf. <u>Cruzan v. Director, Missouri Department of Health.</u> 110 S.Ct. 2841 (1990)) on the basis of the liberty interest of the 14th amendment. Subsequent to the Patient Self-Determination Act, the right to refuse treatment has been emphatically upheld once again in <u>Vacco v. Quill</u> (cf. <u>Vacco v. Quill.</u> 117 S.Ct. 2293 (1997)) on the same basis as it was in <u>Cruzan.</u>

36) Under 42 U.S.C. 1981-1988 Violation of Civil Rights, and 42 U.S.C. § 1985 (3) (Depriving persons of rights or privileges) the plaintiff can be awarded an unspecified amount in compensatory and punitive damages for these violations..

37) In addition to praying for relief for the violations of the Plaintiff's civil rights, the Plaintiff is also praying for relief for the emotional distress this events have caused him.

38) These outrageous intentional and negligent acts by the defendants have caused the Plaintiff severe emotional distress which will be enlarged upon in the last count in this complaint.

39) Mental anguish is the mental suffering like fear, anxiety, depression, grief, etc. faced by a person during an event, period , action or situation. A person can claim damages for mental anguish if it was logically connected to the incident.

40) 'Damages for emotional distress have been permitted ... where there is some means for assuring the validity of the claim. (Molien, supra, 27 Cal.3d at 926-27.) The case law reveals a diversity of circumstances in which recovery for emotional distress may be had. They are loosely linked in the sense that in each it could be said that a particular form of mental suffering naturally ensued from the acts constituting the invasion of another kind of protected interest. 'The commonest example . . . is probably where the plaintiff suffers personal injuries in addition to mental distress as a result of negligent or intentional misconduct by the defendant.' (Crisci, supra, 66 Cal.2d at 433.) Pain and suffering is the natural concomitant of a personal injury. (Capelouto v. Kaiser Foundation Hospitals, supra, 7 Cal.3d 889 ) '[I]n the case of many torts, such as as assault, battery, false imprisonment, and defamation, mental suffering will frequently constitute the principal element of damages.' (State Rubbish, etc. Assn. v. Siliznoff, supra, 38 Cal.2d at 338; see also Deevy v. Tassi, supra, 21 Cal.2d 109 [as assault and battery].) Molien, supra, 27 Cal.3d 916, found sufficient assurance of the validity of a claim of emotional distress in the nature of the cause of action for negligent misdiagnosis, predicated as it was upon a false imputation of syphilis, which by statute constitutes slander per se, an intentional tort. (Id., at pp. 930-31.)

26) The ER room Nurse, J. Ailn continually and repeatedly harassed the Plaintiff in an attempt to obtain his signature on the admission form, and when the Plaintiff's medical surrogate arrived attempted to obtain her signature on the Hospital admission form. When the Plaintiff's medical surrogate refused to sign the admission form, she was directed to Admissions area and the Plaintiff was whisked off to some other area of the hospital.

27) At some point during this period the Defendant J. Ailn forged the hospital admission agreement stating the Plaintiff had given verbal permission to be treated, and told the Plaintiff that Medicare would pay for the entire cost of the stay, (a false inducement in and of itself).

28) At this point, by moving the Plaintiff From the ER to another area of the hospital to another without the Plaintiff's permission the plaintiff was kidnapped.

29) Person is guilty of attempted second degree kidnapping if he knowingly engaged in conduct which is strongly corroborative of the firmness of his purpose to knowingly seize or carry another person from one place to another without his consent and without lawful justification. People v. Lahr, 200 Colo. 425, 615 P.2d 707 (1980); Apodaca v. People, 712 P.2d 467 (Colo. 1985).

30) Movement for a "substantial" distance is not required as an element of second degree kidnapping. People v. Apodaca, 668 P.2d 941 (Colo. App. 1982), aff'd in part and rev'd in part on other grounds, 712 P.2d 467 (Colo. 1985).

31) Taking a person through the use of deceit falls within the term "seize" because it is a taking without the consent of the victim. Consent obtained through deceit is invalid. People v. Maass, 981 P.2d 177 (Colo. App. 1988).

32) Essential elements of the crime of kidnapping are: (1) Wilfulness or intent to do the act; (2) the act must be done without lawful authority; (3) there must be a seizing, or imprisoning; and (4) the act must be done against the victim's will, by means of force or otherwise. People v. Cardwell, 181 Colo. 421, 510 P.2d 317 (1973).

33) "The innocent individual who is harmed by an abuse of governmental authority is assured that he will be compensated for his injury." Owen V. City of Independence, 445 U.S. 622 (1980).

34) During the Plaintiff's overnight stay at the Hospital the Plaintiff was denied his civil rights under 42 U.S.C. 1395 (cc) and assaulted by hospital personal at least 83 times, as verified by the detailed bill the plaintiff received for the unauthorized services and treatment.

SECOND CLAIM FOR RELIEF
AND SUPPORTING FACTUAL ALLEGATIONS
(Please number your paragraphs and attach any necessary additional pages.)

[The Defendants conspired to deny the Plaintiff's constitutional civil Rights of privacy under color of law as assured by the 1st Amendment in addition to his rights under section 1977 (42 U.S.C. 1981) which provides for the recovery of compensatory and punitive damages in cases of intentional violations of Title VII, the ADA, and section 501 of the Rehabilitation Act of 1973; 42 U.S.C.A. s. 1320d-6, HIPPA. Damages can also be awarded]

41)   Plaintiff incorporates paragraphs 1 through 40 of this complaint.

42)   Violation of the Plaintiff's civil rights of privacy as assured by the 1st amendment to the Constitution, and : Title VII, the ADA, and section 501 of the Rehabilitation Act of 1973; 42 U.S.C.A. s. 1320d-6, HIPPA.

43)   Without a valid admission agreement for Porter Adventist hospital, there is no lawful reason why personnel at Porter Adventist Hospital or it's associates should have access to the Plaintiff's medical records. It is a violation of his constitutional rights of unreasonable search and seizure and a violation of his HIPPA rights to the privacy of his medical records.

44)   Denver District Court Case # 2008 CV 3218 found the contract used to obtain those medical records to be invalid and that the Plaintiff owed Porter Adventist Hospital nothing for the services provided.

45)   Further, when a patient arrives at a hospital and refuses treatment, under 1395 (CC) (a) and (DD) the hospital must either release the patient or transfer the patient to a facility that will release him. Specifically on refusal of treatment hospital personnel must immediately complete paperwork for the Plaintiff to sign that shows that treatment was refused and no further treatment can be provided to the Plaintiff.

46)   Porter Adventist hospital personal along with the admitting Doctor Ferdowitz and other unknown hospital personnel as sell as defendants, Anderson, Clement, Dangleis, Draken and Porter Adventist Hospital administrators Boye and Nye outrageously conspired to ignore these rights of the Plaintiff by failing to respond to his letter of notice and denied his right to refuse treatment by ignoring his statements of refusal.

47)   42 U.S.C 1320d-6, subpart E (Security and Privacy) § 164.506 Consent for uses or disclosures (of private medical information) to carry out treatment, payment, or health care operations (C) (ii) states: a covered health care provider that fails to obtain such consent (to obtain and use health: care records) in accordance with paragraph (a)(3)(i) of this section must document its attempt to obtain consent and the reason why consent was not obtained.

48)   Society's commitment to institutional justice requires that judges be solicitous of the rights of persons who come before the court. <u>Geiler v. Commission on Judicial Qualifications</u>, 10 Cal.3d 270, 286, (1973)

49) Conspiracy to deny civil rights  has three elements:

    a. Two or more persons must conspire together to injure, oppress, threaten or intimidate one or more victims.

    b. The defendant intended by the conspiracy to hinder, prevent, or interfere with a person's free exercise or enjoyment of a right secured by the Constitution or laws of the United States.

    c. At least one of the intended victims must be an inhabitant of a state or territory of the U.S.  Plaintiff Lawson was a resident of the state of Colorado at all times relevant to this action.

65) Proof of Conspiracy

A conspiracy is an agreement by two or more persons to accomplish some unlawful purpose, or to accomplish a lawful purpose by unlawful means. United States v. Feola, 420 U.S. 671, 695-96 (1975). Thus, a conspiracy is a kind of partnership in criminal purposes in which each member becomes the agent of every other member.

It is no defense that a defendant's participation in a conspiracy was minor or for a short period of time. Nor does the government [Plaintiff] have to prove that each conspirator joined the conspiracy at the time of its formation, or that each conspirator played an equal role in the conspiracy. United States v. Saavedra, 684 F.2d 1293, 1301 (9th Cir. 1982). A person may be a member of a conspiracy even though the person does not know all of the purposes of the conspiracy. United States v. Escalante, 637 F.2d 1197, 1200 (9th Cir. 1980). A single conspiracy may include subgroups or subagreements, and the evidence need not exclude every hypothesis other than that a single conspiracy exists. United States v. Patterson, 819 F.2d 1495, 1502 (9th Cir. 1987). The Government [Plaintiff] need only prove a slight connection between the defendant and the conspiracy. United States v. Cuevas, 847 F.2d 1417 (9th Cir. 1988).

The Government [Plaintiff] need not prove that the agreement between the co-conspirators was express or formal. The evidence must show that the defendants positively or tacitly came to a mutual understanding to try to accomplish an unlawful plan. See Pereira v. United States, 397 U.S. 1, 12 (1954). Ordinarily, only the results of a conspiracy, rather than the agreement itself, are observable. The existence of the conspiracy need not be proved by direct evidence but may be inferred from all of the facts and circumstances of the case. United States v. Disla, 805 F.2d 1340, 1348 (9th Cir. 1986). Traditionally, courts look to the conduct of the alleged conspirators to find proof of the agreement.

66) Time is not a material fact in conspiracy charge. US V Ghant, 339 F3d (8th Cir. 2003).

67) Proof of Criminal Conspiracy requires an act in furtherance of that conspiracy. US V Bey, 188 F3d 1 (1st Cir. 1999)

68) Conspiring to violate another person's constitutional rights violated §1983. Rowe V City of Fort Lauderdale, 279 F3d 1271 (11th Cir. 2002)

69) A conspirator can withdraw from a conspiracy by (1) disavowing the unlawful goals of the conspiracy; (2) affirmatively acting to defeat the purpose of the conspiracy; or (3) taking definite, decisive, and positive steps to dissociate himself with the conspiracy. US V Fox, 189 F3d 1115 (9th Cir. 1999)

70) Substantive crimes committed in the execution of a conspiracy may be punished separately from the conspiracy itself. US V Chase, 296 F3d 247 (4th Cir. 2002)

71) Time is not a material fact in conspiracy charge. US V Ghant, 339 F3d (8th Cir. 2003)

72) Civil conspiracy is agreement between two or more persons to injure another by unlawful action. Farhat V. Jopke, 370 F3d 580 (6th Cir 2004); Ashlers V Schebil, 188 F3d 365 (6th Cir 1999)

73) To find that an accused participated in a conspiracy, the government {Plaintiff} must show some element of cooperation beyond mere knowledge of the existence of the conspiracy. US V Crossland, 301 F3d 907 (8th Cir. 2002)

74) Conspiracy or an attempt to commit a crime requires the intent to commit the crime and overt acts in furtherance of that intent. US V Taylor, 413 F3d 1146 (10th Cir 2005)

75) It is not all that easy to withdraw from a conspiracy and it is the defendant's burden to show that he did. US V Julian, 427 F3d 471 (7th Cir. 2005)

76) One who comes under this section is equivalent to a principal. People v. Saiz, 42 Colo. App. 469, 600 P.2d 97 (1979).

77) An accessory who stands by and aids, abets, or assists in the perpetration of a crime is deemed and considered as a principal and punished accordingly. Medina v. People, 168 Colo. 255, 450 P.2d 662 (1969).

78) Plaintiff Lawson Prays the court will award sufficient damages to pay for the severe emotional distress and mental anguish the defendants placed on the Plaintiff.

79) Mental Anguish is the mental suffering like fear, anxiety, depression, grief, etc. faced by a person during an event, period, action or situation. A person can claim damages for mental anguish if it was logically connected to the incident.

80) 'Damages for emotional distress have been permitted ... where there is some means for assuring the validity of the claim. (Molien, supra, 27 Cal.3d at 926-27.) The case law

reveals a diversity of circumstances in which recovery for emotional distress may be had. They are loosely linked in the sense that in each it could be said that a particular form of mental suffering naturally ensued from the acts constituting the invasion of another kind of protected interest. 'The commonest example . . . is probably where the plaintiff suffers personal injuries in addition to mental distress as a result of negligent or intentional misconduct by the defendant.' (<u>Crisci</u>, supra, 66 Cal.2d at 433.) Pain and suffering is the natural concomitant of a personal injury. (<u>Capelouto v. Kaiser Foundation Hospitals</u>, supra, 7 Cal.3d 889 ) '[I]n the case of many torts, such as as assault, battery, false imprisonment, and defamation, mental suffering will frequently constitute the principal element of damages.' (<u>State Rubbish, etc. Assn. v. Siliznoff</u>, supra, 38 Cal.2d at 338; see also <u>Deevy v. Tassi</u>, supra, 21 Cal.2d 109 [as assault and battery].) <u>Molien</u>, supra, 27 Cal.3d 916, found sufficient assurance of the validity of a claim of emotional distress in the nature of the cause of action for negligent misdiagnosis, predicated as it was upon a false imputation of syphilis, which by statute constitutes slander per se, an intentional tort. (Id., at pp. 930-31.)

# THIRD CLAIM FOR RELIEF
## AND SUPPORTING FACTUAL ALLEGATIONS
(Please number your paragraphs and attach any necessary additional pages.)

[42 U.S.. U.S.C. 1981-1989 (CIVIL RIGHTS, 42 U.S.C. 1985(3) (Depriving persons of rights or privileges), 42 U.S.C.1985 (2) Obstructing justice; intimidating party, witness, or juror, by unlawfully seizing real property in violation of the 4th Amendment of the U.S. Constitution.]

41) Plaintiff incorporates paragraphs 1 through 40 of this complaint.

42) "There can be no sanction or penalty imposed upon one because of his exercise of Constitutional Rights." Sherar v. Cullen, 481 F. 2d 946 (1973)

43) "…the right to file a lawsuit pro se is one of the most important rights under the constitution and laws." Elmore v. McCammon (1986) 640 F. Supp. 905.

44) "Due to sloth, inattention or desire to seize tactical advantage, lawyers have long engaged in dilatory practices... the glacial pace of much litigation breeds frustration with the Federal Courts and ultimately, disrespect for the law." Roadway Express v. Pipe, 447 U.S. 752 at 757 (1982)

45) 42 U.S.C. 1985(2) (Conspiracy to interfere with civil rights),

(2) Obstructing justice; intimidating party, witness, or juror

If two or more persons in any State or Territory conspire to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully, or to injure such party or witness in his person or property on account of his having so attended or testified, or to influence the verdict, presentment, or indictment of any grand or petit juror in any such court, or to injure such juror in his person or property on account of any verdict, presentment, or indictment lawfully assented to by him, or of his being or having been such juror; or if two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws;

46) Defendants Smith and Franklin entered the conspiracy by contacting under color of law to recover attorneys fees for Denver District Court Case # 2009-CV-8268 which was dismissed with prejudice, without any guidance from the court on the complaint

deficiencies, for medical malpractice without even an evidentiary hearing which the defense attorneys convince the court was medical malpractice suit.

47) This is a blatant abuse of judicial power and abuse of senior citizens in an attempt to influence both a witness to a crime and the victim of a crime to prevent them from testifying in court against the defendant's clients.

48) The Plaintiff's are engaged in wanton, willful, malicious, and reckless behavior in the abuse of at risk adults and as such attempted to cause the death of Plaintiff Lawson through hypertension which was known to the defendant's because this condition was documented in the Denver District Court pleadings and in the evidence submitted in Denver District court Case # 2008 CV 008268 based on the defendant James R. Lawson's falling under the ADA TITLE 42 CHAPTER 126 SUBCHAPTER II Part A section 12131 and 12132; 18 U.S.C. § 1113 Attempt to commit murder or manslaughter, and 18 USC 1512 Tampering with a witness, victim, or an informant

49) Plaintiff Lawson and his ex-wife have been divorced since 1996, as shown in the documents furnished to the Denver District Court in case # 2009 CV 7642 and Case # 2008 CV 8268, adjudicated by the same Judge.

50) This complaint also stated that the suit that was dismissed for medical malpractice. That is a false statement. It was a case of denial of Plaintiff Lawson's Civil Rights.

51) The defendants knowingly, willfully recklessly, and intentionally conspired to psychologically, physiologically, and financially abuse Plaintiff Lawson located at 764 S Osage St Denver, CO, knowing he has hypertension, is a type II diabetic and such abuse could cause a fatal heart attack or debilitating stroke. All of this in an attempt to collect attorney's fees for a Denver District Court Case # 2008 CV 008268 involving violation of James R. Lawson's Civil Rights to refuse medical treatment under 42 U.S.C. 1395 CC (a) and (DD) and his attempt to collect for denial of those rights under 42 U.S,C.. 1983 Civil Rights, as well as attempts to collect for civil racketeering under 18 USC § 1961-1968 (RICCO) .

52) A complaint for attempted homicide was filed with both the Denver Police Department and the FBI listing all the defendants except the defense counsel for Denver Health. No case numbers were provided at that time.

53) This attempt to collect for these attorney fees which were initially computed at $ 39,515.11 was first made on August 16th, 2009 which was Mr. Lawson's 72nd birthday.

54) These co-conspirators allowed an action to be initiated, in Denver District Court case # 2009CV7642, against Plaintiff Lawson and a trust Plaintiff Lawson's ex-wife set up for their children and which Plaintiff Lawson has no financial interest in other than living in the residence held in the trust and paying for these quarters by performing maintenance on the residence. This works out well for both of them, since the residence needs roughly $120,000.00 in repairs.

55) Further, this suite has so affected Plaintiff Lawson psychologically, he has sought help at the VA for depression and thoughts of suicide.

56) Plaintiff Lawson has suffered extreme emotional distress because of these actions, and has been hospitalized at the VA twice since this event for stress induces acute and severe chronic pancreaitits, a condition he has never suffered before.

57) In addition Plaintiff Lawson has suffered recurring nightmares and insomnia after experiencing this event.

58) Further, the trust the residence was held in was a Spendthrift trust and Plaintiff Lawson was not at the time and is not a trustee of the trust, nor was or is Plaintiff Lawson named as a beneficiary of the trust.

59) Myrna E. Barnett-Lawson was a witness to the violation of the Civil rights of Plaintiff Lawson under 42 U.S.C. 1395 (CC) (a) and 42 U.S.C. 1395 (DD) and this ruling is a conspiracy under 42 USC 21 §1985 (2) to:

"Deter by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully, or to injure such party or witness in his person or property on account of his having so attended or testified, or to influence the verdict, presentment, or indictment of any grand or petit juror in any such court, or to injure such juror in his person or property on account of any verdict, presentment, or indictment lawfully assented to by him, or of his being or having been such juror; or if two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws;"

60) The suit against Plaintiff Lawson and the trust was an unlawful seizure of trust control and the residence.

61) Plaintiff Lawson responded to this attempt to seize control of the trust by citing the Color Of Law Statue to the court and moving for a dismissal since the case was under appeal. The court denied this motion to dismiss.

62) This is an illegal confiscation of property under color of law and an abuse of power under the 4th amendment of the Constitution of the U.S. This abuse is actionable under 18 U.S.C. 241 (conspiracy to violate civil rights) and 18 U.S.C 242 (color of law).

63) The Denver District Court ruled on a medical malpractice allegation, not on the allegations made in the complaint filed. The Defendant did not even rule on the RICO allegations, nor on the At Risk Adult Violations., other than to dismiss them with prejudice, which is a clear violation of the CRS that requires he inform the Department of Health and Human Services of Senior abuse.

64) Therefore pursuant to C.R.C.P. 60, there is fraud and misrepresentation in the collection of this judgment because the allegations in the original complaint have never been tried in a court of law.

65) Defendant Stern issued an order allowing the trust to be terminated and a conservator's trust be established for the benefit of the insurance companies representing the medical service providers.

66) Plaintiff Lawson Prays the court will award actual damages of **$1,250.00** for attorneys fees and any punitive damages it find appropriate for this violation of the Plaintiff's Civil Rights.

67) Plaintiff Lawson Prays the court will award sufficient damages to pay for the severe emotional distress and mental anguish the defendants placed on the Plaintiff with this award and to pay for the conversion of the trust to it's original form.

68) Mental Anguish is the mental suffering like fear, anxiety, depression, grief, etc. faced by a person during an event, period , action or situation. A person can claim damages for mental anguish if it was logically connected to the incident.

69) 'Damages for emotional distress have been permitted ... where there is some means for assuring the validity of the claim. (Molien, supra, 27 Cal.3d at 926-27.) The case law reveals a diversity of circumstances in which recovery for emotional distress may be had. They are loosely linked in the sense that in each it could be said that a particular form of mental suffering naturally ensued from the acts constituting the invasion of another kind of protected interest. 'The commonest example . . . is probably where the plaintiff suffers personal injuries in addition to mental distress as a result of negligent or intentional misconduct by the defendant.' (Crisci, supra, 66 Cal.2d at 433.) Pain and suffering is the natural concomitant of a personal injury. (Capelouto v. Kaiser Foundation Hospitals, supra, 7 Cal.3d 889 ) '[I]n the case of many torts, such as as assault, battery, false imprisonment, and defamation, mental suffering will frequently constitute the principal element of damages.' (State Rubbish, etc. Assn. v. Siliznoff, supra, 38 Cal.2d at 338; see also Deevy v. Tassi, supra, 21 Cal.2d 109 [as assault and battery].) Molien, supra, 27 Cal.3d 916, found sufficient assurance of the validity of a claim of emotional distress in the nature of the cause of action for negligent misdiagnosis, predicated as it was upon a false imputation of syphilis, which by statute constitutes slander per se, an intentional tort. (Id., at pp. 930-31.)

# FOURTH CLAIM FOR RELIEF
# AND SUPPORTING FACTUAL ALLEGATIONS

[42 U.S.C. 1981-1988 Violation of Civil Rights, 42 U.S.C. § 1985 (3) (Depriving persons of rights or privileges) Defendants conspired to deny the Plaintiff's Civil right to sue for damages as a victim of Civil racketeering when the Defendant's clients presented false billing statements for payment leading to their participation in the racketeering activity.]

81) Plaintiff incorporates paragraphs 1 through 80 of this complaint.

82) Plaintiff included civil racketeering charges in complaint # 2008CV 8268 of

> 18 U.S.C. § 1961–196 8.and C.R.S. 18-17-101-108

    1)    1) Menacing, 2) Assault, 3) Forgery;4) Kidnapping; 5) False Imprisonment; 6) Criminal extortion/aggravated extortion; 7) Fraud:, including mail fraud, Medical Billing Fraud, and Medicare Fraud 8) formation of an enterprise in fact, 9) use of racketeering money to operate a legitimate enterprise, 10) Conspiracy/Civil Conspiracy/Chain Conspiracy/ Wheel and Hub Conspiracy, 11) Complicity; 12) Aiding and Abetting; 13) identity theft, 14) gathering identity information by deception.

    2)    The Plaintiff may be awarded treble damages in a Civil Racketeering Action plus costs and attorney fees.

    3)    The Plaintiff may be awarded $10,000.00 per incident of identity theft under Colorado Law :

    4)    C R S 18-5-902. Identity theft

    5)    C R S 13-21-122 Civil Liability for unlawful use of personal identifying information.

    6)    C R S 12-21-109.5 Recovery of damages for the fraudulent use of social security Numbers.

    7)    Fogarty, S. and Ortiz, D. (2002). <u>Stealing the Self: Identity Theft and Restrictions on Using and Disseminating Personal Identifiers</u>. Markle Foundation Task Force on National Security in the Information Age.

138) Defendants Batchelor, Barrian, Boinfacio, Cannella, Defranco, Goff, Hobson, Greenberg, Jone, Linder, Sada, joined the conspiracyacting as agents for Porter Adventist Hospital and medical service providers Radiology Imaging Associates and Inpatient Services, when they attempted to collect for charges based on the invalid contract, after they had been served notice that it was not a valid contract and failed to investigate and continued to attempt to Collect for services not authorized. .

139) Necessary and sufficient elements for a successful federal civil RICO claim:

    1.   At least two violations of Federal Law as listed in the Federal Racketeering Act within a four year period. (There is a 4 year statute of imitations on Civil Rico Complaints.)

    2.   There must be an involvement with interstate commerce or trade.

    3.   The creation of an enterprise in fact to perform the racketeering acts, that is separate and distinct from a legitimate organization and operating outside the normal bounds of the legitimate organization.

    4.   The use of any money received from racketeering activity for the purchase or operation of a legitimate business.

    5.   A pattern of activity showing a high probability of continuance.

    6.   Injury resulting from the racketeering activity/acts.

140) There are two acts of kidnapping, based the facts presented, along with assault, menacing, the use of a fraudulent contract, multiple acts of mail fraud, Medicare fraud, attempted fraud on the Veteran's administration and formation of an enterprise in fact, and use of racketeering money to operate legitimate healthcare organizations.

141) Each of these conditions can be established by evidence and testimony.

142) The courts have established a four year statue of limitations for civil racketeering actions.

143) Civil RICO claims are subject to a four-year statute of limitations. The United States Supreme Court adopted this limitations period and applied it to all civil RICO claims in the case of *Agency Holding Corp. v Malley-Duff & Associates, Inc.*, 483 U.S. 143 (1987). Because RICO did not have its own statute of limitations, common law rules dictated that RICO claims should be subject to the statute of limitations applied to the most analogous claim under state law. The Supreme Court did not favor this approach because it would have resulted in civil RICO claims being subject to 50 different limitations periods, and no one could determine the limitations period until a particular claim was brought in a particular jurisdiction. The Supreme Court decided it was more fair and efficient to borrow the limitations period from another federal statute, which would result in a uniform statute of limitations period regardless of the jurisdiction in which a particular RICO claim was filed. Because Congress essentially copied RICO's civil remedy provision (18 U.S.C. ï¿½ 1964(c)) from the civil remedies provision of the Clayton Anti-trust Act, 15 U.S.C. ï¿½ 15(a), the Supreme Court adopted the Clayton Act's four year statute of limitations as the limitations period applicable to all federal civil RICO claims.

144) "...the right to file a lawsuit pro se is one of the most important rights under the constitution and laws." Elmore v. McCammon (1986) 640 F. Supp. 905.

145) The defendants have become liable for the civil racketeering and identity theft allegations because they have aided and abetted in the commission of the crimes.

146) Aiding and abetting is not an independent crime, but simply abolishes the common-law distinction between principal and accessory. <u>U.S. V. COOPER</u>, 375 F3d 1041 (10th Cir. 2004)

147) To aid and abet, a defendant must associate with the criminal venture, participate in it, and seek by his action to make the venture succeed. US V. VILLANUEVA, 408 F3D 193 (5TH Cir. 205)

148) Federal crime of aiding and abetting requires knowledge of illegal activity that is being aided and abetted, desire to help it succeed, and some act of helping. US V Serrano, 422 F3d 207 1003 (7th Cir 2006)

149) In a prosecution for conspiracy, proof of an agreement may be shown by circumstantial evidence which indicates that the conspirators, by their acts, pursued the same objective, with a view toward obtaining a common goal. People v. Cabus, 626 P.2d 1159 (Colo. App. 1980). The circumstances necessary to support a conviction for conspiracy are those which show that the alleged conspirators pursued by their acts the same objective, one performing one part, and the other another part, with a view to completing the acts and attaining the common objective. People v. Wilkinson, 38 Colo. App. 365, 561 P.2d 347 (1976); People v. Williams, 707 P.2d 1023 (Colo. App. 1985).

149) Movement for a "substantial" distance is not required as an element of second degree kidnapping. People v. Apodaca, 668 P.2d 941 (Colo. App. 1982), aff'd in part and rev'd in part on other grounds, 712 P.2d 467 (Colo. 1985).

150) Taking a person through the use of deceit falls withing the term "seize" because it is a taking without the consent of the victim. Consent obtained through deceit is invalid. People v. Maass, 981 P.2d 177 (Colo. App. 1988).

151) Essential elements of the crime of kidnapping are: (1) Willfulness or intent to do the act; (2) the act must be done without lawful authority; (3) there must be a seizing, or imprisoning; and (4) the act must be done against the victim's will, by means of force or otherwise. People v. Cardwell, 181 Colo. 421, 510 P.2d 317 (1973).

152) "Court errs if court dismisses pro se litigant without instruction of how pleadings are deficient and how to repair pleadings." B.Platsky v. CIA, 953 F.2d 25, 26 28 (2nd Cir. 1991),

Conclusion

153) By reviewing each of the civil racketeering allegations individually the defendants conspired to aid and abet the commission of civil racketeering allegations and have become liable as principles for the allegations.

154) Accordingly treble damages should be awarded the plaintiff for the attempt to collect on the false billing statements as shown in the exhibit based on the false contract used for billing purposes.

155) In addition, the Plaintiff should be awarded damages of $10,000.00 for each unauthorized use of his identity by each of the Defendants.

# FIFTH  CLAIM FOR RELIEF
## AND SUPPORTING FACTUAL ALLEGATIONS

[42 U.S.C. 1981-1988 Violation of Civil Rights, 42 U.S.C. § 1985 (3)  (Depriving persons of rights or privileges), under 42 U.S.C. 126 (A) § 12131 and 12132 (Americans with Disabilities Act),  Restatement of Second Torts Section 46 cmt. H(1965); Intentional Infliction of Emotional Distress and Negligent Infliction of Emotional Distress .]

156) Plaintiff incorporates paragraphs 1 through 155 of this complaint.

157) The Plaintiff has been a victim of crime, and the system does not want to listen or prosecute the perpetrators because they are too well connected and have to much influence and power to stand trial in a criminal court of law.

158) Each of the defendants have individually and collectively contributed to the intentional and negligent infliction of malicious, willful and intentional infliction of severe, extreme emotional pain, mental anguish, loss of enjoyment of life, thoughts of suicide, isolation from friends and family, sleeplessness, anxiety, stress, depression,  blood pressure increases, headaches, humiliation, extreme and outrageous intentional invasions of mental and emotional tranquility, which are diagnosable medically and medically significant, and other non pecuniary losses on  the Plaintiff.

159) A list of the negligent and outrageous conduct is contained in the plaintiff's affidavit of emotional distress suffered at the hands of the defendants attached as exhibit 2.

160) The International Association for the Study of Pain has published the following definition of pain which reflects what has been learned about pain in the last four centuries, and primarily in the past half century.

161) Pain is "an unpleasant sensory and emotional experience associated with actual or potential tissue damage, or described in terms of such damage" (Merskey, 1986).

162)  Pain and Suffering Definition: – pain and suffering includes the loss of physical abilities, such as the use of your hand or foot, and physical discomfort, such as chronic backache or stiffness in your neck. The term also includes any emotional pain you might suffer, such as worry, anxiety, embarrassment, and the loss of the pleasures and enjoyment of life.

163) In torts involving extreme and outrageous intentional invasions of mental and emotional tranquility, the outrageous conduct affords the necessary assurance of the validity of the claim. (Id. at 927.) Recovery also has been sanctioned for emotional distress which could be said naturally to ensue from an act which invaded an interest protected by an established tort. (See, Sloane v. Southern Cal. Ry. Co., supra, 111 Cal. 668 [humiliation from wrongful ejection from train]; State Rubbish, etc. Assoc. v. Siliznoff, supra, 38 Cal.2d 330 [intentional infliction of emotional distress]; Crisci v. Security Ins. Co., supra, 66 Cal.2d 425 [physical injuries and psychosis resulting from fall through opening]; see also Acadia, California, Ltd. v. Herbert (1960) 54 Cal.2d 328, 337 [mental suffering occasioned for fear for safety of family caused by trespass]; Kornoff v. Kingsburg Cotton Oil Co. (1955) 45 Cal.2d 265, 271 [discomfort and annoyance caused by nuisance]; Herzog v. Grosso (1953) 41 Cal.2d 219, 225

[annoyance ensuing from trespass].)' (<u>Merenda v. Superior Court</u> (1992) 3 Cal.App.4th 1, 8-9.

164) The conduct must be heinous and beyond the standards of civilized decency or utterly intolerable in a civilized society. Whether the conduct is illegal does not determine whether it meets this standard. IIED is also known as the tort of "outrage," due to a classic formulation of the standard: the conduct must be such that it would cause a <u>reasonable person</u> to exclaim "Outrageous!" in response.

165) Some general factors that will persuade that the conduct was extreme and outrageous: (1) there was a pattern of conduct, not just an isolated incident; (2) the plaintiff was vulnerable and the defendant knew it; (3) the defendant was in a position of power. <u>Taylor v. Metzger</u>, 706 A.2d 685 (N.J. 1998); and <u>GTE Southwest, Inc.</u> *v. Bruce*, 998 S.W.2d 605 (Tex. 1999).

166) The tort of intentional infliction of emotional distress has four elements:

> (1) the defendant must act intentionally or recklessly;
>
> (2) the defendant's conduct must be extreme and outrageous;
>
> (3) that the extreme or outrageous conduct caused;
>
> (4) severe emotional distress. <u>Hyatt</u>, 943 S.W.2d at 297.

167) Although case law does not provide us with a precise definition of "extreme and outrageous," the test adopted by Missouri courts for actionable conduct is that the conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Restatement (Second) of Torts section 46 cmt. d (1965). The defendant's conduct must be more than malicious and intentional; and liability does not extend to mere insults, indignities, threats, annoyances, or petty oppressions.

168) In <u>Viehweg v. Vic Tanny Intern. of Missouri, Inc.</u>, 732 S.W.2d 212, 213 (Mo.App.1987). "It is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery...." Restatement (Second) of Torts section 46 cmt. h (1965). The court must determine whether an average member of the community upon learning of the facts alleged by plaintiff would exclaim "outrageous!" <u>Viehweg</u>, 732 S.W.2d at 213.

169) Some Missouri courts have extrapolated the standard for the negligent infliction of emotional distress to intentional infliction of emotional distress cases and required under <u>Bass v. Nooney Co.</u>, 646 S.W.2d 765, 772-773 (Mo. banc 1983) that the emotional distress be medically diagnosable and medically significant. <u>Hyatt</u>, 943 S.W.2d at 297; see also <u>Young</u>, 664 S.W.2d at 265. If the Bass test is applicable to intentional infliction of emotional distress cases, plaintiff satisfied that test by pleading in her petition that the emotional distress she suffered was medically diagnosable and significant and required her to seek medical treatment. <u>Polk v. INROADS/St. Louis, Inc.</u>, 951 S.W.2d 646, 648 (Mo.App. E.D. Jul 22, 1997)

170) Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and Title II of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12131 <u>et seq.</u> <u>provides for damamges for emotional distress.</u> Now before the Court are the remaining issues relating to relief. In its previous memorandum, the United States,

as <u>amicus curiae</u>, urged the Court to hold that compensatory damages are available forms of relief under both statutes. In response to an argument raised by the defendants in their motion for summary judgment, we demonstrate below that neither an overt nor physical manifestation of emotional injury is necessary to support an emotional distress claim for compensatory damages.

## Argument

A.   Compensatory damages are available under both section 504 of the Rehabilitation Act and title II of the ADA. Such damages include compensation for the mental and emotional distress that has resulted from defendants' violation of these civil rights statutes. This distress need not be evidenced by any physical manifestation of injury. Testimony describing significant emotional pain and mental anguish, such as that detailed in Plaintiff's affidavit in support of his motion for summary judgment, is sufficient to warrant a compensatory damage award.

B.   This Court recently held that the type of emotional distress endured by Galloway warrants monetary compensation. In Doe v. District of Columbia, 796 F. Supp. 559, 573 (D.D.C. 1992), a section 504 case, the Court noted that the plaintiff's "testimony established the emotional pain he endured from his rejection and the sense of isolation he felt from being singled out on the basis of his [disability]." Based on the plaintiff's testimony, compensatory damages were awarded. See also Tanberg v. Weld County Sheriff, 787 F. Supp. 970, 973 (D.Colo. 1992) (money damages warranted to compensate plaintiff for mental anguish where the plaintiff was discriminated against on the basis of his disability).

C.   Similarly, in Carter v. Duncan-Huggins, Ltd., 727 F.2d 1225, 1238 (D.C. Cir. 1984), the District of Columbia Circuit Court of Appeals affirmed a jury award of compensatory damages for the humiliation and other emotional harm that the plaintiff had endured after being discriminated against on the basis of her race. The court noted that feelings of humiliation and isolation, albeit intangible, are cognizable and compensable injuries. Id. The plaintiff's testimony that she "felt isolated," that her "mind just flew out" when she heard a racist anecdote, and that she was shocked by an accusation of incompetence was sufficient evidence to justify the jury award. Id.

D.   The decisions in Doe and Carter are fully consistent with other courts' interpretations of various civil rights laws. A number of circuit courts have held that emotional distress damages may be awarded in civil rights cases where the sole evidence of emotional injury is the plaintiff's testimony, and where there has been no overt or physical manifestation of such injury. See, e.g., United States v. Balistrieri, 981 F.2d 916, 931 (7th Cir. 1992) (plaintiffs' testimony that they felt "angry and upset," "hurt and disappointed," "disbelief and kind of a hurt feeling like feeling real sorry," and "surprised" sufficient to support emotional distress damage awards in Fair Housing Act case); Johnson v. Hale, 940 F.2d 1192, 1193-94 (9th Cir. 1991) (testimony that plaintiffs were acutely upset because they had been denied the opportunity to rent or inspect advertised rental units on the basis of their race and that they had begun to suspect that their white friends were racist sufficient to support emotional

distress damage award in housing discrimination case); Marable v. Walker, 704 F.2d 1219, 1220-21 (11th Cir. 1983) (plaintiff's testimony in Fair Housing Act case that he had been embarrassed and humiliated by defendant's refusal to rent an apartment to him on the basis of his race sufficient to establish right to an evidentiary hearing regarding the amount of emotional distress damages that should be awarded); Williams v. Trans World Airlines, 660 F.2d 1267, 1272-73 (8th Cir. 1981) (specific proof of out-of-pocket losses or medical testimony not necessary to establish humiliation or mental distress in employment discrimination case arising under 42 U.S.C. § 1981; plaintiff's own testimony may be sufficient) Seaton v. Sky Realty Co., 491 F.2d 634, 636 (7th Cir. 1974) (award for emotional distress upheld in housing discrimination case where only direct evidence of emotional distress was plaintiff's testimony that "I was humiliated. I was intimidated, not only as a person but as a man. He stripped me of my right as a father to my kids."). Indeed, as the District of Columbia Circuit Court of Appeals stated in Hobson v. Wilson, 737 F.2d 1, 62 (D.C. Cir. 1984), cert. denied, 470 U.S. 1084 (1985), a case arising under the civil rights conspiracy statute, 42 U.S.C. § 1985(3):

171) The factfinder may measure plaintiff's testimony in light of the surrounding circumstances, and in proper circumstances award damages on the basis of plaintiff's testimony. In reaching its conclusion, the court or jury may consider, as elements of compensable injury for emotional distress, humiliation and personal indignity, emotional pain, embarrassment, fear, anxiety, and anguish.

172) Carey v. Piphus, 435 U.S. 247 (1978). In Carey, the Supreme Court held that mental anguish and emotional distress are compensable injuries under § 1983. 435 U.S. at 263-64. The Court further held that substantial damages may be recovered only for the actual injury suffered, and that the plaintiff must demonstrate injury to secure more than a nominal recovery. Id. at 266. Nevertheless, although the Court noted in a footnote that mental and emotional distress "may be evidenced by one's conduct and observed by others," id. at 264 n.20 nowhere did it require an overt or physical manifestation of emotional distress. Rather, the Court stated that, although a showing of actual injury is necessary, such injury can be proven by "showing the nature and circumstances of the wrong and its effect on the plaintiff." The court also said the the award of damages must be supported by competent evidence concerning the imjury. 435 U.S. at 264 n, 20. Id. at 263-64. See also Balistrieri, 981 F.2d at 930, 931-932, citing Carey v. Piphus:

- [I]n determining whether the evidence of emotional distress is sufficient to support an award of damages, we must look at both the direct evidence of emotional distress and the circumstances of the act that allegedly caused that distress.

173) Many circuit courts have held that the type of emotional distress and mental anguish described is sufficient to support an award of compensatory damages in civil rights cases.

A. The Court should hold that neither an overt nor physical manifestation of emotional injury is necessary to establish an emotional distress claim under Section 504 or title II of the ADA.

174) I Emotional Distress Damages in Federal Civil Rights Action

    A. Some, but not All Federal Civil Rights Statutes Permit Recovery for Emotional Distress.

175) Uncapped emotional distress damages are recoverable under the post-Civil War Civil Rights Acts, 42 U.S.C. " 1981 and 1983. Patterson v. McLean Credit Union, 491 U.S. 164, 182n. 4 (1989) (Section 1981); Hafer v. Melo, 502 U.S. 21, 31 (1991) (Section 1983).1 The 1991 Civil Rights Act permits emotional distress damages in cases brought under Title VII, the Americans with Disabilities Act, 42 U.S.C. '12117(a), and the Rehabilitation Act of 1973, 29 U.S.C. '794(a)(1). See, generally, 42 U.S.C. ' 1981A (1991). These damages are capped based on the size of the employer. 42 U.S.C. ' 1981A(b)(3). The Age Discrimination in Employment Act does not provide for emotional distress damages. C.I.R. v. Schleier, 515 U.S. 323 (1995).

176) The 1991 Civil Rights Act refers to a variety of types of compensable injury that may be more or less appropriate given the kind of claim you are litigating: A emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and other nonpecuniary losses at 42 U.S.C. ' 1981A (b)(3).

177) Compensatory damages are available under Section 1983 only against state and local officials sued in their *individual* capacities. They may not be recovered against these officials in their *official* capacities in a Section 1983 claim. Will v. Michigan Dept. of State U.S.C. ' 1981A (b)(3).

178) Expert Testimony is Not Required to Support an Emotional Distress Claim Under the Federal Civil Rights Acts. Emotional distress damages are available even where the plaintiff has not sought medical treatment.

179) A [M]edical testimony, although relevant, is not necessary. . . . [T]he plaintiff's own testimony may be sufficient to establish humiliation or mental distress.at Williams v. TWA, 660 F. 2d 1267 (8th Cir. 1981). See also Hammond v. Northland Counseling Center, 218 F.3d 866 (8th Cir. 2000); Ross v. Douglas County, Nebraska, 234 F. 3d 391 (8th Cir. 2000).

180) The U.S. Supreme Court has noted with respect to emotional distress damages that A genuine injury in this respect may be evidenced by one=s conduct and observed by others at Carey v. Piphus, 435 U.S. 247, 264 n. 20 (1978). The Eighth Circuit has held that a plaintiff's own testimony may be adequate to support such an award and the testimony of family and friends is also probative. Kucia v. Southeast Arkansas Community Action Corp., 284 F. 3d 944, 947 (8th Cir. 2002) (plaintiff's own testimony enough); Morse v. Southern Union Co., 174 F. 3d 917, 925 (8th Cir. 1999) (affirming $100,000 emotional distress award where family members corroborated plaintiff's testimony); Kim v. Nash Finch Co., 123 F. 3d 1046, 1065 (8th Cir. 1997) ( award of $100,000 affirmed where plaintiff, his wife and his son testified regarding anxiety, sleeplessness, stress, depression, high blood pressure, headaches and humiliation).

181) It is important to remember that a plaintiff must offer A specific facts as to the nature of his or her claimed emotional distress and its causal connection to the allegedly violative actions. Police, 491 U.S. 58., 71 (1989); Hafer, 502 U.S. at 31.. Hammond, 218 F.3d at 893; see also, Kim, 123 F. 3d at 1065.

182) Some Issues to Watch Out for When Experts Do Testify on Emotional Distress

183) Psychologists May Testify.

184) Expert testimony must pass muster under Fed. R. Evid. 702. The authorities do not require the testimony of a psychiatrist and psychologists often testify in these cases effectively. Jenson v. Eveleth Taconite Co., 130 F.3df 1287, 1297-99 (8th Cir. 1997) (citing with approval a number of cases where psychologists testified about the causal connection between discriminatory conduct and emotional injury).

185) Mental Health Experts May Not Testify On Issue of Plaintiff's Credibility.

186) In Nichols v. American National Ins., 154 F.3d 875 (8th Cir. 1998), the Eighth Circuit held that a psychiatric expert may not comment on reliability [of plaintiff's testimony] in the guise of a medical opinion. The Court held, further, that testimony regarding psychiatric credibility, recall bias and motivation to lie or exaggerate based on secondary gain is in admissible because it invades province of jury.

187) Plaintiff's Expert Can Testify Re: Future Emotional Distress Damages

188) A plaintiff can collect future emotional distress damages if he or she has evidence, probably from an expert, to support such an award. Kientzy v. McDonnell Douglas, 990 F. 2d 1051(8th Cir. 1993); Rowe v. Hussmann Corp., 381 F. 3d 775, 783 (8th Cir. 2004).

189) The Standard for Awarding Punitive Damages under the Federal Civil Rights Statutes. Subject to caps, punitive damages are available against private employers under the 1991 Civil Rights Act,42 U.S.C. ' 1981A where  A) the respondent engaged in a discriminatory proactive or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual.@ 42 U.S.C.' 1981A(b)(1). This standard is virtually identical to the traditional standard for uncapped punitive damages liability under 42 U.S.C. " 1981 and 1983. Smith v. Wade, 461 U.S. 30, 56 (1983). in Kolstad v. American Dental Assoc., 527 U.S. 526 (1999), the United States Supreme Court held that, at least under the statutes that were amended by the 1991 Civil Rights Act, it is not enough to show that the conduct at issue was intentional in order to obtain punitive damages. Rather,  A) an employer must at least discriminate in the face of a perceived risk that its actions will violate federal law in order for a plaintiff to recover punitive damages. In so holding, the Court rejected the proposition that punitive damages are available only where the conduct at issue is egregious: Egregious misconduct is often associated with the award of punitive damages but the reprehensible character of the conduct is not generally considered apart from the requisite state of mind. 527 U.S. at 538. The decision goes on to address the  A) proper legal standard for imputing liability to the employer in the punitive damages context, holding that a plaintiff must show that  A) An employee serving in a managerial capacity committed the wrong acting in the scope of employment  Further, an employer may escape liability for such conduct if the discriminatory conduct of its manager was contrary to the employer's  A) good faith efforts to comply with the law. 527 U.S. at 543-545. Applying this standard, the Eighth Circuit has upheld punitive damages awards under Kolstadt in the following circumstances: - where an employer=s managers ignored complaints of harassment, did not investigate repeated reports of harassment, failed to take action designed to stop the conduct, maintained policies that effectively served to punish the victims. Madison v. IBP Inc., 257 F.3d 780 (2001); see also Blackmon v. Pinkerson Security & Investigative Services, 182 F. 3d 629 (8th Cir. 1999). - where the employee whose

conduct was at issue was a manager with substantial authority who testified that he had A) extensive sexual harassment training and was familiar with the company's policies against harassment. Ogden v. Wax Works, Inc., 214 F.3d 999, 1010 (8th Cir. 2000).- where an employer discriminates in contravention of its own policies against discrimination, since the mere existence of these policies does not mean that the employer escapes liability for punitive damages, particularly where the discriminatory conduct was reported to higher management who took little action..

190) MacGregor v. Mallinckrodt, Inc. 373 F. 3d 923, 932 (8th Cir. 2004).- applying the Kolstad standard to Fair Housing Act violations, where the owner testified that he had been in the rental business for 28 years and was aware of the Act's prohibitions. Badami v. Flood, 214 F. 3d 994 (8th Cir. 2000).- in the ADA context, where managers admitted that they were aware of the requirements of the ADA and their own company's policy listing a flexible schedule as a possible accommodation to an employee's disability, but stated that they did not have to follow the policy. Foster v. Time Warner Entertainment Co., 250 F.3d 1189, 1196-97 (8th Cir. 2001).

191) III. The Eighth Circuit Has Recently Upheld Very Substantial Emotional Distress and Punitive Damages in Egregious Cases of Sexual and Racial Harassment.

192) In three recent harassment cases, the Eighth Circuit has upheld very substantial compensatory and punitive damages awards. These cases are worth looking at to get a feel for what the Court will uphold under the right circumstances:

193) Rowe v. Hussmann Corp., 381 F. 3d 775, 782 (8th Cir. 2004), upholding an award of $500,000 in compensatory damages for emotional distress and $1,000,000 in punitive damages in a sexual harassment case. The Court held that the awards were not excessive in light of the years-long harassment and the company=s failure to take any action despite repeated complaints.

194) Williams v. ConAgra Poultry Co., 378 F. 3d 790, 796-97 (8th Cir. 2004), upholding an award of $173,156 in compensatory damages and $500,000 in punitive damages on a racially discriminatory termination claim and $600,000 on the racial harassment claim, while reducing the punitive damage award on the harassment claim to $600,000 from $6,063,750. The Court notes that the evidence of harassment was egregious, there were contradictions in the testimony of managers and evidence of deliberate indifference because of the failure to take meaningful action after many complaints to upper management.

195) Baker v. John Morrell & Co., 382 F. 3d 816, 832 (8th Cir. 2004), upholding awards of $839,470 in compensatory damages, and $300,000 in punitive damages remitted from a verdict of $650,000. In this case, the degrading comments, actions and physical assaults drove plaintiff to a suicide attempt and mental hospitalization, and the company denied a hostile environment even after years of this conduct.

196) The weight of a nonexpert's opinion is for the jury. Leick v. People, 136 Colo. 535, 322 P.2d 674, cert. denied, 357 U.S. 922, 78 S. Ct. 1363, 2 L. Ed.2d 1366 (1958); Rupert v. People, 163 Colo. 219, 429 P.2d 276 (1967).

197) The Colorado Tenth Judicial District Commission on Judicial Performance recently issued a recommendation of "do not retain" for Judge Adele Anderson, a judge in Pueblo County. Anderson was one of two out of 83 judges who was not recommended for retention. The Commission's decision was based on a survey

conducted to evaluate Judge Anderson's performance. Respondents to the survey included members of law enforcement, attorneys, litigants, jurors, criminal defendants, courthouse personnel and crime victims. One of the bases for the Commission's decision was that some survey respondents noted Judge Anderson's "demeaning and harsh treatment of individuals appearing in her court without legal counsel

198) The California Commission on Judicial Performance publicly censured a judge for failing to respect the rights of pro se litigants. Inquiry Concerning Judge Fred L. Heene, Jr., No. 153, October 13, 1999. This seems to be the only case in which a judge has been disciplined for the judge's treatment of unrepresented individuals.

199) The judge's actions violated several canons of the code of judicial conduct, including: canon 1, "a judge shall uphold the integrity and independence of the judiciary"; canon 2A: "a judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary"; and canon 3B: "a judge shall perform the duties of judicial office impartially and diligently."

200) Plaintiff Lawson Prays the court will award sufficient damages to pay for the severe emotional distress, mental anguish knowingly, maliciously, willfully and intentionally inflicted severe, extreme emotional pain, loss of enjoyment of life, thoughts of suicide, isolation from friends and family, and other non pecuniary losses the defendants caused the Plaintiff to suffer.

201) Mental anguish is the mental suffering like fear, anxiety, depression, grief, etc. faced by a person during an event, period , action or situation. A person can claim damages for mental anguish if it was logically connected to the incident.

202) 'Damages for emotional distress have been permitted ... where there is some means for assuring the validity of the claim. (Molien, supra, 27 Cal.3d at 926-27.) The case law reveals a diversity of circumstances in which recovery for emotional distress may be had. They are loosely linked in the sense that in each it could be said that a particular form of mental suffering naturally ensued from the acts constituting the invasion of another kind of protected interest. 'The commonest example . . . is probably where the plaintiff suffers personal injuries in addition to mental distress as a result of negligent or intentional misconduct by the defendant.' (Crisci, supra, 66 Cal.2d at 433.) Pain and suffering is the natural concomitant of a personal injury. (Capelouto v. Kaiser Foundation Hospitals, supra, 7 Cal.3d 889 ) '[I]n the case of many torts, such as as assault, battery, false imprisonment, and defamation, mental suffering will frequently constitute the principal element of damages.' (State Rubbish, etc. Assn. v. Siliznoff, supra, 38 Cal.2d at 338; see also Deevy v. Tassi, supra, 21 Cal.2d 109 [as assault and battery].) Molien, supra, 27 Cal.3d 916, found sufficient assurance of the validity of a claim of emotional distress in the nature of the cause of action for negligent misdiagnosis, predicated as it was upon a false imputation of syphilis, which by statute constitutes slander per se, an intentional tort. (Id., at pp. 930-31.)

203) Mental and emotional distress are compensable under §1983 even in the absence of physical injury. Daskalea V District of Columbia, 227 F3d 433 (D.C. Cir. 2000)

204) Plaintiff can seek damages for pain, suffering, embarrassment, and humiliation in action brought under §1983 Shamaeizadeh V Cunigam, 338 F3d 535 (6th Cir. 2003)

205) A plaintiff bringing a civil rights claim may be compensated for intangible, psychological injuries, as well as financial, property, or physical harm. <u>Ferril V Parker Group, Inc.</u>, 168 F3d 468 (11th Cir. 1999)

206) Psychological injuries can serve as a basis for a § 1983 liability. <u>Tarver V City of Edena</u>, 410 F3d 745 (5th Cir. 2005)

207) For a comprehensive list of emotional distress see the attached <u>Plaintiff's affidavit of emotional distress suffered at the hands of the defendants</u>

## REQUEST FOR RELIEF

Plaintiff requests the following relief:

For these reasons, Plaintiff Lawson requests this court to enter judgment in favor of Plaintiff on each and every count contained in this complaint, in his individual and representative capacity, and against each and every Defendant for actual and punitive damages in an amount to be determined at trial, for interest, costs, and attorney fees, and for such further relief as this Court deems just, using the attached Exhibit of damages outlining the type and number of civil rights violation ignored by the defendants. These damages were computed using 42 U.S.C. 21 §§1981, 1981A, 1983, & 1988 CIVIL RIGHTS and 18 U.S.C. 96 § 1961-1968. (RICO) RACKETEER INFLUENCED AND CORRUPT ORGANIZATION.

Costs and attorney fees which can be awarded in certain civil rights cases as stated in TITLE 42 CHAPTER 21 SUBCHAPTER I § 1988 (b) Proceedings in vindication of civil rights with such other relief as the court may deem reasonable and just under the circumstances.

(Continued on the next page)

### PLAINTIFF DEMANDS A TRIAL BY A JURY ON ALL ISSUES SO TRIABLE.

Date: 6/9/2010

(Plaintiff's Original Signature)
764 So Osage St./PO Box 9758
_____
(Street Address)
Denver, CO 80209-0758
_____
(City, State, ZIP)
303-935-3282 LL/720-220-4081 Cell
_____
(Telephone Number)

Uncapped emotional distress damages are recoverable under the post-Civil War Civil Rights Acts, 42 U.S.C. " 1981 and 1983. Patterson v. McLean Credit Union, 491 U.S. 164, 182n. 4 (1989) (Section 1981); Hafer v. Melo, 502 U.S. 21, 31 (1991) (Section 1983).1 The 1991 Civil Rights Act permits emotional distress damages in cases brought under Title VII, the Americans with Disabilities Act, 42 U.S.C. '12117(a), and the Rehabilitation Act of 1973, 29 U.S.C. '794(a)(1). *See, generally*, 42 U.S.C. ' 1981A (1991).

The 1991 Civil Rights Act refers to a variety of types of compensable injury that may be more or less appropriate given the kind of claim you are litigating: A emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and other nonpecuniary losses;. 42 U.S.C. ' 1981A (b)(3).

## B. Expert Testimony is Not Required to Support an Emotional Distress Claim Under

the Federal Civil Rights Acts. Emotional distress damages are available even where the plaintiff has not sought medical treatment.

A [M]edical testimony, although relevant, is not necessary. . . . [T]he plaintiff's own

testimony may be sufficient to establish humiliation or mental distress. Williams v. TWA, 660 F. 2d 1267 (8th Cir. 1981). *See also* Hammond v. Northland Counseling Center, 218 F.3d 866 (8th Cir. 2000); Ross v. Douglas County, Nebraska, 234 F. 3d 391 (8th Cir. 2000).

The U.S. Supreme Court has noted with respect to emotional distress damages that

A genuine injury in this respect may be evidenced by one=s conduct and observed by others. Carey v. Piphus, 435 U.S. 247, 264 n. 20 (1978). The Eighth Circuit has held that a plaintiff's own testimony may be adequate to support such an award and the testimony of family and friends is also probative. Kucia v. Southeast Arkansas Community Action Corp., 284 F. 3d 944, 947 (8th Cir. 2002) (plaintiff's own testimony enough); Morse v. Southern Union Co., 174 F. 3d 917, 925 (8th Cir. 1999) (affirming $100,000 emotional distress award where family members corroborated plaintiff's testimony); Kim v. Nash Finch Co., 123 F. 3d 1046, 1065 (8th Cir. 1997) ( award of

$100,000 affirmed where plaintiff, his wife and his son testified regarding anxiety, sleeplessness, stress, depression, high blood pressure, headaches and humiliation).

It is important to remember that a plaintiff must offer A specific facts as to the nature of his or her claimed emotional distress and its causal connection to the allegedly violative actions. Police, 491 U.S. 58., 71 (1989); Hafer, 502 U.S. at 31.. Hammond, 218 F.3d at 893; *see also,* Kim, 123 F. 3d at 1065.

Some Issues to Watch Out for When Experts Do Testify on Emotional Distress Issues.

(1) Psychologists May Testify.

Expert testimony must pass muster under Fed. R. Evid. 702. The authorities do not require the testimony of a psychiatrist and psychologists often testify in these cases effectively. Jenson v. Eveleth Taconite Co., 130 F.3df 1287, 1297-99 (8th Cir. 1997) (citing with approval a number of cases where psychologists testified about the causal connection between discriminatory conduct and emotional injury).

(2) Mental Health Experts May Not Testify On Issue of Plaintiff's Credibility.In Nichols v. American National Ins., 154 F.3d 875 (8th Cir. 1998), the Eighth Circuit held that a psychiatric expert may not comment on reliability [of plaintiff's testimony] in the guise of a medical opinion. .The Court held, further, that testimony regarding, psychiatric credibility, recall bias and motivation to lie or exaggerate based on , secondary gain is inadmissible because it invades province of jury.

(3) Plaintiff's Expert Can Testify Re: Future Emotional Distress Damages

While this case could be tried and won on any single issue contained in this complaint, the series of events that have taken place show such a blatant, wanton, malicious, and intentional criminal disregard for the Plaintiff's Civil Rights that this pattern of criminal activity by people and institutions that are charged with protecting the public and the public interest that it needs to be exposed and punished so that those who would pursue the same pattern in the future are deterred from taking the course of action established in this cause of action..

It is a question of: "Would you want your grand parents, or your parents, or your sister, or your brother, or your aunts and uncles, or other family members, or even yourself, to find yourself in the circumstances described by the events that occurred in this case and be the intentional victim of the institutions and caregivers described here?"

The behavior of the organizations and individuals in this complaint, and those that support them, suggests they believe they are above the law and immune from prosecution for their wrongs. In our present culture they might even be categorized and looked upon as medical terrorists with

their attitude toward an individual's rights in their attempts to force their will upon an individual who does not want their services.

3) Background:

The idea of a right to privacy originated in America. A future Supreme Court judge, Justice Brandeis and another young lawyer, Samuel D. Warren, published an article called 'The Right to Privacy' in the Harvard Law Review in (1890) arguing that the constitution and the common law allowed for the deduction of general "right to privacy". Their project was never entirely successful and the renowned tort expert Dean Prosser argued that "privacy" was composed of four separate torts, the only unifying element of which was a (vague) "right to be left alone." These elements were

1. appropriating the plaintiff's identity for the defendant's benefit
2. placing the plaintiff in a false light in the public eye
3. publicly disclosing private facts about the plaintiff
4. unreasonably intruding upon the seclusion of solitude of the plaintiff

The right was elevated to a non-textual constitutional principle in Roe v. Wade, where it protects a woman's right to have an abortion.

The Right to Privacy is further embodied in the specific Federal Statues created in recent times:

• Health Information Privacy Accountability Act -- Office for Civil Rights U.S. Department of Health and Human Services
• Financial Services Modernization Act (GLB), 15 U.S. Code §§ 6801-6810
• Final Rule on Privacy of Consumer Financial Information, 16 Code of Federal Regulations, Part 313
• Fair Credit Reporting Act (FCRA), 15 U.S. Code §§ 1681-1681u

Ex. Ord. No. 13353. Establishing the President's Board on Safeguarding Americans' Civil Liberties

Ex. Ord. No. 13353, Aug. 27, 2004, 69 F.R. 53585, provided:

By the authority vested in me as President by the Constitution and the laws of the United States

of America, and in order to further strengthen protections for the rights of Americans in the effective performance of national security and homeland security functions, it is hereby ordered as follows:

Section 1. Policy. The United States Government has a solemn obligation, and shall continue fully, to protect the legal rights of all Americans, including freedoms, civil liberties, and information privacy guaranteed by Federal law, in the effective performance of national security and homeland security functions.

The Patient Self-Determination Act: Meeting the Challenges in Patient Care
Copyright 1998 Lawrence P. Ulrich, Ph.D. 1. The Explicit Demands of the Law.
The requirements of the Patient Self-Determination Act are deceptively simple. In spite of their apparent simplicity they carry profound implications for the way healthcare is practiced. The law mandates that, in those healthcare institutions which receive Medicare or Medicaid funding, patients must be informed in writing upon admission of (1) their right to accept or refuse treatment, (2) their rights under existing state laws regarding advance directives, and (3) any policies which the institution has regarding the withholding or withdrawing of life-sustaining treatments.(1) The institutions are also required to engage in on-going educational activities for both their employees and the general public regarding the right to accept or refuse treatment and regarding the opportunity for drafting or signing advance directives.

The law was passed by Congress November 5, 1990 and went into effect December 1, 1991. It is based on the principles of informed consent. The law lays the foundation for the exercise of the patient's decision-making authority which will affect the course of treatment for all patients whether or not they possess decisional capacity. By extending the law to all healthcare institutions including hospitals, extended care facilities, hospices, HMOs, and home healthcare agencies virtually all individuals seeking healthcare will be covered. The only exceptions might be those few institutions where services are paid for directly by patients independently of government funding.

The law does not give any new rights to patients except the right to be informed of the stipulated matters at the time of admission to certain healthcare facilities. It generally reaffirms rights which patients already possess, such as the right to refuse treatment.(2) Unfortunately patients have not always been aware of these rights and for this reason they have all too often become victims of the decisions of others. The right of patients to receive adequate information about

matters which will help them exercise their self-determination in healthcare practices is underscored by the new duty imposed upon healthcare facilities to provide specific information to them.

If the spirit of the Patient Self-Determination Act is to be accomplished, more than perfunctory notification will be required and a more in depth understanding of the advantages of the law will be necessary. To put it simply, the Patient Self-Determination Act can enable patients to become better decision-makers in healthcare by accomplishing the following goals. (1) It provides clear ethical and legal recognition of the authority of patients and surrogates in the healthcare setting by affirming the control which they have in making many decisions about their lives and what transpires in them. (2) By identifying the decisional authority of patients and surrogates in the healthcare setting, it provides the opportunity to reflect upon what is important to them in selecting healthcare interventions. (3) It can reinforce the opportunity to choose those alternatives which will allow them to achieve their goals even after the onset of decisional incapacity. (4) Finally, it extends the ideals of political liberty into the daily decisions which individuals make about one of the most central and problematic areas of their lives, namely, the direction of their healthcare. Each of the notifications and requirements contribute to these purposes.

The right of patients to consent to or refuse treatments is the basis of everything to be found in this law. This is an application of the basic liberty which we all enjoy in a democratic society. It is a common misunderstanding that the initiation of medical treatments is automatic with the onset of a pathology. Conceptually speaking there is nothing in the concept of pathology that requires treatment. For this reason the initiation of treatment requires consent. The right to consent to treatment has a long history in the law.(6) While the right to refuse treatment is implied in the right to consent, taking the form of withholding consent,(7) it has only been extensively articulated in the law during the last 20 years.(8) In spite of the clear identification of this right in both ethics and the law, patients often think that they must accept treatments when they are offered. In a sense the offering of treatment often "defaults" to its initiation with very little actual reflective decision-making on the part of the patient involved. The Patient Self-Determination Act is intended to amplify autonomous decision-making by helping patients clearly understand that they can take control of their healthcare even to the point of refusing any or all treatments.

ENDNOTES

1. Patient self-determination act of 1990, sections 4206 and 4751 of Omnibus Reconciliation Act of 1990, Pub L No. 101-508 (November 5, 1990).

"SEC. 4206. MEDICARE PROVIDER AGREEMENTS ASSURING THE IMPLEMENTATION OF A PATIENT'S RIGHTS TO PARTICIPATE IN AND DIRECT HEALTH CARE DECISIONS AFFECTING THE PATIENT.

"[The Patient Self-Determination Act applies] in the case of hospitals, nursing facilities, home health agencies, and hospice programs, . . . and a provider of services or prepaid or eligible organization [to] maintain written policies and procedures with respect to all adult individuals receiving medical care by or through the provider or organization ------

(A) to provide written information to each such individual concerning ------

(i) an individual's rights under State law (whether statutory or as recognized by the courts of the State) to make decisions concerning such medical care, including the right to accept or refuse medical or surgical treatment and the right to formulate advance directives . . . and
(ii) [to provide] the written policies of the provider or organization respecting the implementation of such rights;

(B) to document in the individual's medical record whether or not the individual has executed an advance directive;

(C) not to condition the provision of care or otherwise discriminate against an individual based on whether or not the individual has executed an advance directive (this shall not be construed as requiring the provision of care which conflicts with an advance directive);

(D) to ensure compliance with requirements of State law (whether statutory or as recognized by the courts of the State) respecting advance directives at facilities of the provider or organization

(this shall not be construed as prohibiting the application of a State law which allows for an objection on the basis of conscience for any health care provider or an agent of such provider which as a matter of conscience cannot implement an advance directive); and

(E) to provide (individually or with others) for education for staff and the community on issues concerning advance directives. . . .

The written information . . . shall be provided to an adult individual ------

(A) in the case of a hospital, at the time of the individual's admission as an inpatient,

(B) in the case of a skilled nursing facility, at the time of the individual's admission as a resident,

(C) in the case of a home health agency, in advance of the individual coming under the care of the agency,

(D) in the case of a hospice program, at the time of initial receipt of hospice care by the individuals from the program, and

(E) in the case of an eligible organization . . . or an organization provided under [Medicare or Medicaid] at the time of enrollment of the individual with the organization.

. . . the term 'advance directive' means a written instruction, such as a living will or durable power of attorney for health care, recognized under State law (whether statutory or as recognized by the courts of the State) and relating to the provision of such care when the individual is incapacitated."

2. The right to refuse treatment will be more fully explored in section five of chapter six. Its constitutionality was first established in Quinlan (cf. In re Quinlan. 70 N.J. 10, 355 A.2d 647 (1976)) based on the right to privacy and has been reiterated by many state courts on the same basis. On the federal level the right to refuse treatment was upheld in Cruzan (cf. Cruzan v. Director, Missouri Department of Health. 110 S.Ct. 2841 (1990)) on the basis of the liberty

interest of the 14th amendment. Subsequent to the Patient Self-Determination Act, the right to refuse treatment has been emphatically upheld once again in Vacco v. Quill (cf. Vacco v. Quill. 117 S.Ct. 2293 (1997)) on the same basis as it was in Cruzan.

# REQUEST FOR RELIEF

Computation of request for relief.>

|  |  | Multiplier | Amount Involved | Number of Defendants affected | Amount Due |
|---|---|---|---|---|---|
| **Racketeering Claim** |  |  |  |  |  |
|  | Porter Adventist Hospital | 3 | $960.00 | 1 | $2,880.00 |
|  | **Inpatient Services** | 3 | $480.00 | 1 | $1,460.00 |
|  | **Radiology Imaging Associates** | 3 | $160.00 | 1 | $480..00 |
| **Number of times Plaintiff's rights were violated** |  |  |  |  |  |
|  |  | 83 | $300,000.00 | 1 | $32,900,000.00 |
| **Civil Rights Claims** |  |  |  |  |  |
|  | **Total Criminal Allegations in the Complaint** | 23 | $300,000.00 | 4 | $27,600,000.00 |
|  | **Assaults while Falsely Imprisoned** | 22 | $300,000.00 | 4 | $26,400,000.00 |
| **Statutory Penalty for Identity Theft** |  |  |  |  |  |
|  |  |  | $10,000.00 | 4 | $40,000.00 |
| **Costs** |  |  |  |  |  |
|  | Filing Fees |  |  |  | $214.00 |

# REQUEST FOR RELIEF

Computation of request for relief.>

|  | Jury Fees |  |  |  | $190.00 |
|---|---|---|---|---|---|
|  | Appeal |  |  |  | 223.00 |
| Total Statutory Damages Prayed For |  |  |  |  | $86,945,425.00 |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No: __2010 – CV – 01063-BNB__

### **James R. Lawson**

## PLAINTIFF

v.

| | | |
|---|---|---|
| J. Ailn R.N. | Dr. Scott Anderson M.D., | Carolyne M. Batchelor, |
| Marnie Barrian C.P.A, | Amy Bonifacio, | Jim W. Boye, |
| David Cannella, | Scott Clements M.D., | Keith Dangleis M.D., |
| Mike DeFranco | Thomas Drake M.D., | Andrew Fedorwicz M.D, |
| Mr Franklin, | Mr. Goff | Alan Greenberg, |
| Tim Gulbranson EMT, | Terry Hobson, | Maria Jones |
| Lindsey Linder, | Carolyne Nye, | Caroline M. Sada, |
| Susan Sander | Randy Shaw, | Tim Smith |
| Bridget Szobar EMT, | | |

## **DEFENDANTS**

# PLAINTIFF'S AFFIDAVIT OF EMOTIONAL DISTRESS SUFFERED AT THE HANDS OF THE DEFENDANTS

I James R. Lawson, declare under penalty of perjury:

I am the Plaintiff; James R. Lawson, in the case of James R. Lawson V J. Ailn R.N., Dr. Scott Anderson M.D., Carolyne M. Batchelor,  Marnie Barrian C.P.A, Amy Bonifacio, Jim W. Boye,  David Cannella, Scott Clements M.D., Keith Dangleis M.D., Mike DeFranco, Thomas Drake M.D., Andrew Fedorwicz M.D, Mr Franklin, Mr. Goff, Alan Greenberg, Tim Gulbranson EMT, Terry Hobson,  Maria Jones,   Lindsey Linder, Carolyne Nye,Caroline M. Sada,  Susan Sander, Randy Shaw,Tim Smith, and Bridget Szobar EMT,

1. At 69 years old, (birth date 8/16/1937) when this event was initiated , I was, and currently remain an at risk adult by law subject to psychological, physical, and financial abuse and exploitation by individuals and institution in positions of power and trust.

2. On December 11th,  2008 at 9:00 A.M.  a case management hearing was held in the law offices of Grund, Dagner, & Nelson, P.C. located at 303 E 27th Avenue, suite 303 in Denver. CO Per  Colo. R.C.P. 16, the defense attorney for Porter Adventist Hospital.  The indication at the conclusion of this hearing was that the senior attorney would file the certificate of pretrial hearing with the court. In place of the certificate of notices of a pretrial hearing, the defendants filed a review of each of the racketeering allegations and a motion the complaint be dismissed with prejudice.  This was a clear outrageous, intentional, and reckless intention to create severe emotional distress for the plaintiff.  This result act of bad faith resulted in my not even opening the mail from the attorneys for a month because of the ensuing humiliation, and depression from this act.

3. I was for all intents and purposes, after the dismissal with prejudice by the Lower court on motion from the Defendants, catatonic for a full month after the defendants evaluated the racketeering allegations individually and the Denver District Court Dismissed them.  This was especially devastating since the defendants had indicated that a report of a pretrial hearing would be filed with the Denver District Court and the complaint would then move forward for trail, and they moved for dismissal instead..

4. After this act, I had thoughts of suicide, and even spoke to my democratic precinct captain about it, as well as several other precinct committee persons.

5. I felt isolated and humiliated because I had I had been sharing the progress of this complaint in the courts with the District precinct committee members in attendant at the monthly meetings.

6. I even attempted to obtain treatment at the Denver Veterans administration by visiting the Veterans Administration Emergency room and reporting thoughts of suicide.

7. My feelings of rejection and dejection lasted many weeks....I felt that the Court was telling me that I was not worthy of any civil rights protection as a veteran and as a United States citizen, that I was incapable and incompetent to know that I had been the victim of a crime. I felt a denial of self worth and sense of alienation.. I realized that I was considered not as a person, but solely as a member of a minority group, judged on the basis of my willingness to trust in the honor and ethics of the judicial system.

8. For weeks, I have been fixated on the incident and have become irritable, hostile, and aggressive. It has become my sole topic of conversation. My family and personal relationships have suffered.

9. When the defendants filed suite in Denver District court for control of the trust which the house the I was living in under the guise of the color of law, with the outrageous argument and claim that the trust was for my benefit, even though the trust was designated as a spendthrift trust that was supposedly immune from all creditors, and which the plaintiff was neither a trustee or a named beneficiary. This act not only heightened the severe emotional pain, mental anguish, loss of enjoyment of life, isolation, stress and sleeplessness I experienced.

10. Then the intentional and negligent infliction of emotional distress was heightened when the legal assistant of the senior attorney mailed a copy of the Court the Appeals affirmation that the lower court decision had been affirmed. This was an intentional and negligent infliction of emotional distress and invasion of mental and emotional tranquility.

11. I have become so distressed that I no longer believe the Judicial system and law enforcement system is either fair or honest in investigating and prosecuting civil rights violations or criminal acts.

12. Plaintiff served eight years in the Marine corps and has become so disillusioned with the system and Distrustful of the United States government he would not serve again or recommend any other young person serve to protect a corrupt government. Nor would he work in the military industrial complex even though at one time he held a "Q" clearance.

13. My blood sugar readings are now out of control as a result of the stress the defendants' intentional and negligent acts of sever emotional distress the defendants have placed on me.

14. Because my blood sugar readings are out of control and as a result of the stress the defendants' intentional and negligent acts of sever emotional distress the defendants have placed on me, my creatin levels for my kidney function have increased and I am now headed toward kidney failure.

15. I have suffered two incidents of stress induced pancreatitis that were very painful and hospitalized me for days at the veterans administration. These attacks will probably be plague me for the rest of my life.

16. I had to have an operation for cancer during the pleading process which the defendants knew about.

17. There is no longer any desire for me to practice the guitar, the banjo, or the piano because of the emotional distress.

18. There will be no exploring of the blue roads (secondary roads colored in blue on state maps) on a motor cycle as initially planned before these events.

19. I have been forced to purchase medications in Mexico during this period because I could not afford to obtain them from the Veterans Administration.

20. I am anxious about the lack of protection available from local and national law enforcement agencies for violating my medical civil rights. Every time I see an ambulance making a run I wonder if the EMT's are going to violate someone else's rights of medical self determination.

21. I have had recurring and will continue to have recurring nightmares about being homelessness because of the defendant's actions in seizing control of the spend thrift trust

22. I now fear Lawyers are not willing to follow the rules, uphold the law and uphold the Constitution voluntarily. They have become a sociopathic aristocracy who believe they are above the law and immune from it. Thus, the only way for citizens to enjoy their constitutional rights is for the Court to issue severe and likely financial sanctions to force them to uphold the rules, the laws, and the Constitution. The non-existence of severe and likely punishment has ended rule of law in the United States. The only way to restore rule of law is to impose severe punishment on the lawyers and their clients who violate those rights. Even thought I once considered going to law school myself, I would no longer consider associating with the profession.

23. I fear for the roughly 80 million senior citizens who are retiring in poverty in the next 10 to 20 years. If the defendants are willing to do this to me, they will intentionally inflict all the emotional stress they can on the new retirees because of greed and for purely financial reasons and the opportunity to profit from their acts without anyone fighting back because most seniors do not understand or know their rights.

24. I don't believe either the Denver District Court believe "Decency, security and liberty alike demand that government officials shall be subjected to the rules of conduct that are commands to the citizen. In a government of laws, existence of the government will be imperiled if it fails to observe the law scrupulously. Our government is the potent, omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the government becomes a lawbreaker, it breeds contempt for the law, it invites every man to come a law unto himself. It invites anarchy. (United States v. Olmstead, 277 U.S. 438 (1928).

Signed _____ On this __9th__ day Of June , 2010.
James R. Lawson/Plaintiff

Subscribed and sworn to before me this _____9_____ day of June, 2009 2010.

_____
(Notary Public)

1900 Grant St Suite 110
(Address) Denver, CO 80203

My commission expires: March 17th 2012

BRETT T. RUDER
NOTARY
PUBLIC
STATE OF COLORADO

My Commission Expires March 17, 2012